**KEYSTONE DEDICATED LOGISTICS, INC., Appellee**

v.

**JGB ENTERPRISES, INC., Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 9, 2013.

Filed Aug. 6, 2013.

Michael D. Brophy, Philadelphia, for appellant.

Lawrence P. Lutz, Butler, for appellee.

BEFORE: DONOHUE, SHOGAN and WECHT, JJ.

OPINION BY SHOGAN, J.:

This is an appeal by Appellant, JGB Enterprises, Inc. ("JGB"), defendant below, from the judgment entered March 16, 2012,[1] following a jury verdict awarding

**1.** The notice of appeal, filed February 21, 2012, stated that the appeal was from the January 26, 2012 order denying post-trial relief. An appeal from an order denying post-trial motions is interlocutory. Pa.R.A.P. 301(a), (c), and (d); *Mackall v. Fleegle*, 801 A.2d 577, 580 (Pa.Super.2002). "[O]nce that judgment is entered [however,] . . . our jurisdiction is perfected." *Minich v. City of Sharon*, 325 Pa.Super. 178, 472 A.2d 706, 707 (1984). Herein, judgment was entered on March 16, 2012. "Thus, even though the appeal was filed prior to the entry of judgment, it is clear that jurisdiction in appellate

Appellee, Keystone Dedicated Logistics, LLC ("Keystone"), plaintiff below, damages of $70,000.00 in its breach of contract claim against JGB. Verdict Sheet, 12/2/11, at 1. We vacate the judgment and remand for a new trial on damages.

JGB, located in Liverpool, New York, is an industrial hose distributor owned and operated by Jay Bernhardt. N.T., 12/1–2/11, Vol. II, at 305. JGB receives about 10,000 contracts per year, which is approximately eighty percent of JGB's business, from the United States Department of Defense ("DoD"). *Id,* at 306–307. The DoD uses a scoring system to evaluate contractors' on-time deliveries and selects contractors based upon the combination of technical ability, price, and score. *Id, at* 307–308. JGB attributes its frequent contracting with the DoD to its superior on-time delivery score. *Id.*

Keystone, located in Carnegie, Pennsylvania, is a national freight logistics company that negotiates, services, and manages freight contracts for clients at a cost savings. N.T., 12/1–2/11, Vol. I., at 37–38, 137–138. Keystone, through its former national sales manager, Michael Wagner, contacted JGB in September of 2007, offering it the possibility of freight savings through Keystone's logistic services. *Id.,* at 75, 78–79. Mr. Bernhardt, who received the call, was interested in the possibility of cost reduction with continued service quality and sent prior freight invoices to Keystone for its analysis. *Id,* at 80.

On October 30, 2007, Mr. Wagner traveled with a Keystone sales representative to JGB's headquarters where they met with Mr. Bernhardt to discuss Keystone's proposed Transportation Services Agreement ("Agreement"). N.T., 12/1–2/11, Vol. I, at 81–82; Agreement, 10/7/07. Randall

Tomasino, JGB's production and traffic manager, and JGB's president also were present at the meeting. N.T., 12/1–2/11, Vol. I, at 82; N.T., 12/1–2/11, Vol. II, at 331. During the meeting, Mr. Wagner explained the procedure Keystone would follow if JGB signed the Agreement. N.T., 12/1–2/11, Vol. I, at 85. Keystone would make a bid request with freight carriers, prepare a Benchmark Rate Calculation ("Benchmark") based on JGB's current rates for comparison to the submitted bids, and subsequently meet with JGB to select the carrier. *Id.* at 85–86, 88, 93. Any savings below this Benchmark would be split between JGB and Keystone. Agreement, 10/7/07, at Schedule A, ¶ 4. Mr. Wagner also noted that Keystone provided a one-year trial period to new clients. N.T., 12/1–2/11, Vol. I, at 85; N.T., 12/1–2/11, Vol. II, at 342–343. Throughout this process, JGB representatives emphasized the importance of service and their preference to continue with UPS Freight, if possible. N.T., 12/1–2/11, Vol. I, at 138–140; N.T., 12/1–2/11, Vol. II, at 309–314, 340. After Mr. Wagner's presentation and without further review, Mr. Bernhardt signed and dated the Agreement. N.T., 12/1–2/11, Vol. I, at 85; Agreement, 10/7/07, at 2. The parties did not enter the effective date in paragraph four. Agreement, 10/7/07, at 1.

The Agreement's language relevant to this appeal is as follows:

4. *Term and Termination*

The initial term of this Agreement shall begin on _____, 2007 ("Effective Date") and shall remain in full force and effect for forty eight (48) consecutive months from the date that the parties agree on carrier pricing; provided, how-

---

courts may be perfected after an appeal notice has been filed upon the docketing of a final judgment." *Johnston the Florist, Inc. v.*

*TEDCO Construction Corp.,* 441 Pa.Super. 281, 657 A.2d 511, 513 (1995) (*en banc*).

ever, in the event that the parties are unable to agree on carrier pricing within ____ days of the Effective Date, either party may terminate this Agreement upon written notice to the other.

\* \* \*

*One Year Trial Period—Early Termination:* If after twelve months (365) days of this Agreement and prior to the completion of the 15th month of this Agreement JGB no longer desires to utilize the services of [Keystone], JGB may elect to terminate this Agreement. To terminate this Agreement, JGB must deliver a written cancellation notice to [Keystone] and also provide [Keystone] with an opportunity to meet JGB in person. If after JGB and [Keystone] meet in person JGB desires to follow through with the termination of this [A]greement, **Cancellation will take effect 90 days from the date of the meeting.** If JGB terminates this [A]greement, JGB shall only be obligated to pay for any services rendered by [Keystone] pursuant to this Agreement and up to the effective date of termination.

*Standard of Services provided—General Termination:* This Agreement can be terminated at any time "for cause" by providing written notice to the other party. "For cause" is defined as either party being in default of its commitments set forth in this Agreement and attached schedules. If either party serves written notice of said termination "for cause", the other party shall have thirty (30) days to remedy the default.

Agreement, 10/7/07, at 1–2 (emphasis in original).

The Agreement continues on "Schedule A," which provides as follows:

[Keystone] will be authorized to negotiate rates on behalf of JGB Enterprises, Inc. and JGB Enterprises, Inc. agrees to utilize those freight companies when said freight companies provide a cost savings over current programs and meet expected service levels defined by JGB Enterprises, Inc.

\* \* \*

Upon review of freight invoices from JGB Enterprises, Inc., [Keystone] will establish a "Benchmark Rate Calculation" which is defined in Schedule "B" and will be approved and agreed upon by both parties. JGB Enterprises, Inc. will compensate [Keystone] by the formula set forth below for all recognized freight savings. [Keystone] shall calculate transportation savings defined as "Benchmark Rate Calculation" less [Keystone] transportation arrangement or other transportation arrangements that are less than "Benchmark Rate Calculations[.]" The difference shall be the "Transportation Cost Savings[.]"

Agreement, 10/7/07, at Schedule A, ¶¶ 2, 4. Below these paragraphs, Schedule A delineates the saving distribution at fifty percent to each party. *Id,* at Schedule A, ¶ 4.

After the initial meeting, there was some delay in acquiring the materials from JGB necessary to prepare the bid request and the Benchmark. N.T., 12/1–2/11, Vol. I, at 88–90. Once Keystone acquired these materials, attained carrier bids, and prepared the Benchmark, the companies' representatives met again. *Id,* at 90–92. On March 11, 2008, JGB's representative, Mr. Tomasino, signed the Benchmark documentation, and despite his prior stated preference to utilize UPS Freight, he agreed to use FedEx Freight as its carrier. N.T., 12/1–2/11, Vol. I, at 87; Agreement, 10/7/07, at Appendix B. This decision was based on FedEx Freight's low bid combined with Keystone's demonstration of FedEx Freight's service quality. N.T., 12/1–2/11, Vol. I, at 94, 100–101.

In the ensuing weeks, JGB transferred its freight orders to FedEx Freight. N.T., 12/1–2/11, Vol. I, at 96; N.T., 12/1–2/11, Vol. II, at 349. JGB began experiencing problems as of April 1, 2008.[2] N.T., 12/1–2/11, Vol. I, at 172; N.T., 12/1–2/11, Vol. II, at 365. In total, JGB experienced twelve to sixteen shipment issues with FedEx Freight out of approximately 1,100–1,200 total shipments. N.T., 12/1–2/11, Vol. I, at 107, 172–173. Although Keystone satisfactorily addressed these issues as they arose, Mr. Tomasino expressed concern regarding JGB's ability to use FedEx Freight if the issues continued to occur. N.T., 12/1–2/11, Vol. II, at 366–368.

On July 22, 2008, Mr. Tomasino, in his capacity as production and traffic manager, sent an e-mail[3] to Keystone notifying it of JGB's intent to terminate the contract. N.T., 12/1–2/11, Vol. I, at 105; N.T., 12/1–2/11, Vol. II, at 370–371. Mr. Wagner sent a follow-up e-mail indicating his preference to hold a conference call to discuss JGB's termination of the contract. N.T., 12/1–2/11, Vol. I, at 105; N.T., 12/1–2/11, Vol. II, at 370–372. During this conference call, which took place later that day, Mr. Wagner reminded Mr. Tomasino of the options for cancellation. N.T., 12/1–2/11, Vol. I, at 105–106. Mr. Tomasino sent a follow-up e-mail stating the following:

> As for the contract, it is signed by you and dated October 30th, 2007. As the contract states there's a one year trial period. So that would expire October 30th, 2008, and that you require 60-day notification not to continue on a second

year with JGB. JGB will honor the contract as dated and had decided not to do further business at this time with [Keystone].

N.T., 12/1–2/11, Vol. II, at 386.

JGB immediately ceased shipments with FedEx Freight, transferring all business back to UPS Freight. N.T., 12/1–2/11, Vol. II, at 374. Mr. Tomasino testified that he did not accept rates lower than the Benchmark prior to October 30, 2008, declining to take advantage of the better rates negotiated by Keystone on JGB's behalf. *Id.* at 375, 380–383. This testimony is called into question, however, by invoices from UPS Freight that utilized Keystone's pricing system and reflected a discount rate which matched that of FedEx Freight. N.T., 12/1–2/11, Vol. I, at 235; N.T., 12/1–2/11, Vol. II, at 412–414.

Keystone filed a complaint against JGB on October 7, 2008, alleging breach of contract, unjust enrichment, and *quantum meruit.* Complaint, 10/7/08, at 3–4. A jury trial followed, during which Keystone focused solely on the breach of contract claim. N.T., 12/1–2/11, Vol. I, at 8–9, 289. To demonstrate damages, Keystone presented UPS Freight invoices showing cost savings after JGB's termination, which the court admitted into evidence over objection. *Id.* at 208–219. Keystone also presented testimony of its Vice President of Operations, Richard Coyner, regarding the contents of the invoices, which the court also allowed over objection. *Id.*

On December 2, 2011, the jury found that JGB breached its contractual obli-

---

2. The exhibit evidencing these problems was not included in the record certified to this Court on appeal. It appears to have been sent out with the jury during deliberations. N.T., 12/1–2/11, Vol. II, at 469.

3. In response to the question of how he first notified Keystone of JGB's intent to terminate the contract, Mr. Tomasino stated, "I believe

it was a conversation with Mike Wagner. Somebody else I believe was in that conversation. I'm not a hundred percent sure." N.T., 12/1–2/11, Vol. II, at 370. This representation conflicts with the testimony of Mr. Wagner, who stated that Mr. Tomasino sent an e-mail to notify Keystone. N.T., 12/1–2/11, Vol. I, at 105.

gations to Keystone and caused monetary damages of $70,000.00. Verdict Sheet, 12/2/11, at 1. JGB filed a timely motion for post-trial relief on December 12, 2011, which the court denied on January 26, 2012. Order, 1/26/12, at 1. JGB filed a timely notice of appeal on February 21, 2012. Both the trial court and Appellant complied with Pa.R.A.P. 1925.

JGB raises the following four issues on appeal:

1. Where the [Agreement] between the parties specifically required the companies selected by [Keystone] to meet "expected service levels defined by JGB", which requirement was neither defined by the [Agreement] nor satisfied in practice, did the trial court jury err by concluding that JGB breached the [A]greement, and owed fees to [Keystone], after JGB terminated the Agreement and transferred its business to another carrier?

2. Did the trial jury err in awarding damages to [Keystone] where JGB properly terminated the contract as of July 22, 2008, thereby relieving JGB of any future fee obligations to [Keystone] as a matter of law?

3. Did the trial court abuse its discretion by admitting into evidence invoices issued by freight carrier UPS, where the offering party, [Keystone], never properly authenticated these documents, which were the cornerstone of [Keystone's] case on damages against JGB?

4. Did the trial court abuse its discretion by permitting [Keystone] witness Richard Coyner to testify as to the contents of UPS invoices, where such invoices had not been properly authenticated and did not fit within

any exception to the Rule against admissibility of hearsay evidence?

JGB's Brief at 4–5.

■ When faced with questions of contractual interpretation, the applicable standard and scope of review is well settled.

Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is de novo and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.

*Ruby v. Abington Memorial Hospital,* 50 A.3d 128, 132 (Pa.Super.2012) (internal quotations omitted). Moreover, we have stated:

Determining the intention of the parties is a paramount consideration in the interpretation of any contract. The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. However, as this Court stated in *Herr Estate,* 400 Pa. 90, 161 A.2d 32 (1960), "where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances."

We first analyze the contract to determine whether an ambiguity exists requiring the use of extrinsic evidence. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the par-

ties intended by the ambiguous provision is for the trier of fact. *Missett v. Hub International Pennsylvania, LLC,* 6 A.3d 530, 541 (Pa.Super.2010). "Where the language of the contract is ambiguous, the provision is to be construed against the drafter." *State Farm Fire and Casualty Company v. PECO,* 54 A.3d 921, 928 (Pa.Super.2012).

JGB first argues that the parties' intent regarding the plain language of the Agreement was clear: "JGB only had to use [FedEx Freight] if it met the expected service levels as defined by JGB." JGB's Brief at 13. This argument is preceded, however, with an outline of the legal standard to be applied in the case of an ambiguity and succeeded with a discussion of extrinsic evidence ordinarily inadmissible as parol evidence where an ambiguity is not present. *Id.* at 9, 13–14. JGB's argument is inconsistent, and it is unclear whether JGB maintains that the Agreement is unambiguous or that an ambiguity exists that should be construed in its favor.

Keystone responds that JGB essentially argues that the jury's verdict was not supported by the evidence. Keystone's Brief at 7. Keystone posits that factual questions existed regarding this evidence, and because these questions were properly put to the jury to resolve, this Court "simply has no basis for re-examining facts determined by a jury." *Id.* at 9.

It is clear to us that the language of the Agreement regarding "Standard of Services provided—General Termination" ("General Termination Clause") is not, itself, ambiguous. Agreement, 10/7/07, at 2. The Agreement unequivocally states that it may be terminated for cause by providing written notice of the default and allowing thirty days for the default to be remedied. *Id.* When read in conjunction with paragraph two of "Schedule A," however, the Agreement is ambiguous, and it is reasonably susceptible to differing interpretations as to what constitutes "cause" for which the Agreement can be terminated. Schedule A states that JGB agreed to use freight companies that met expected service levels as defined by JGB. *Id.* at Schedule A. JGB's definition of these service levels, however, is not ascertainable from the writing; we, therefore, are required to look beyond it to resolve the ambiguity.

The record reveals that conflicting parol evidence exists as to the parties' understanding of JGB's expected service levels. Through testimony, JGB demonstrated Mr. Bernhardt's and Mr. Tomasino's concerns regarding freight service and cited JGB's repeated service problems with FedEx Freight. N.T., 12/1–2/11, Vol. I, at 138–140; N.T., 12/1–2/11, Vol. II, at 309–314, 364–365. Keystone, however, demonstrated that FedEx Freight's performance was above industry standards and showed that JGB would experience service problems with all carriers, including UPS Freight. N.T., 12/1–2/11, Vol. I, at 94, 100–101; N.T., 12/1–2/11, Vol. II, at 327–328. Such matters must be resolved by the trier of fact. *Missett,* 6 A.3d at 541.

Instantly, the jury found that JGB breached the Agreement; thus, it is evident that the jury resolved these conflicts in Keystone's favor. Verdict Sheet, 12/2/11, at 1. This jury determination ensued notwithstanding the proper instruction to the jury to construe ambiguities against Keystone as the drafter of the Agreement. N.T., 12/1–2/11, Vol. II, at 461. JGB challenges this finding, arguing that the evidence clearly showed that FedEx Freight did not meet expected service levels defined by JGB. Thus, JGB suggests there was no basis for the jury to conclude that JGB breached the Agreement with Keystone. JGB's Brief at 15.

Such a challenge to the jury's finding goes to the weight of the evidence. We note our standard of review for such a challenge:

A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the jury, and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.

*Winschel v. Jain,* 925 A.2d 782, 788 (Pa.Super.2007). Based on the record, which reveals the conflicting testimony discussed above, it is clear that the trial court did not abuse its discretion in upholding the jury's finding that JGB did not have grounds to terminate the Agreement for cause. We will not substitute our judgment for that of the jury.

▮ Furthermore, even if JGB had valid grounds for termination, such termination would have been ineffective because "conditions precedent to a contract termination must be strictly fulfilled. . . . 'To be effective, a notice for the rescission or termination of a contract must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission.'" *International Diamond Importers, Ltd. v. Singularity Clark, L.P.,* 40 A.3d 1261, 1271 (Pa.Super.2012) (citing *Wright v. Bristol Patent Leather Co.,* 257 Pa. 552,

101 A. 844, 845 (1917)). Herein, the Agreement required JGB to provide written notice of the default and allow thirty days for Keystone to attempt to remedy the default. Although JGB's initial e-mail, *see* footnote 3, constituted written notice because Keystone assented to it, JGB did not insist on immediate rescission, did not identify the default, and did not give Keystone thirty days to remedy the default. N.T., 12/1–2/11, Vol. II, at 374, 386. To the contrary, Mr. Tomasino stated that JGB would honor the Agreement through October 30, 2008, indicating that JGB was terminating under the "One Year Trial Period—Early Termination" Clause ("Early Termination Clause"). JGB immediately changed shipping providers rather than wait thirty days for service defaults to be remedied. *Id.* JGB, therefore, did not fulfill the conditions precedent delineated in the General Termination Clause.

▮ JGB next argues that if it did not effectively terminate the Agreement under the General Termination Clause, it did so under the Early Termination Clause. JGB's Brief at 15–17. Once again, JGB is unclear in its argument. JGB first suggests that the evidence at trial was clear "that JGB intended to terminate the Agreement in July 2008." N.T., 12/1–2/11, Vol. I, at 16. JGB later represents that Mr. Tomasino of JGB told Mr. Wagner of Keystone that JGB considered the Agreement "to be terminated effective October 30, 2008, one year following its execution." *Id.* Despite the gap between July 22, 2008, when JGB ceased shipments through FedEx Freight, and October 30, 2008, when JGB was allowed to terminate under the Early Termination Clause, JGB contends that "there was no basis for the jury to award damages to [Keystone]." *Id.* at 17.

In response, Keystone adopts the position of the trial court, which stated, "The award of $70,000.00 in favor of [Keystone]

appears to represent the lost 'commissions' not earned by [Keystone] as a result of JGB's improper and premature termination of the [Agreement] prior to October of [2008]." Trial Court Opinion, 5/18/12, at 5. As there was a dispute as to when the Agreement actually began, the question properly was put to the jury.

We are persuaded that the Agreement also is ambiguous regarding the process of early termination under the Early Termination Clause. It provides that JGB may, at will, elect to terminate the Agreement "after twelve months (365 days) of this Agreement" provided notice is sent prior to the completion of the fifteenth month. Agreement, 10/7/07, at 1. This notice must be sent in writing to Keystone expressing JGB's intention to terminate, and JGB must provide an opportunity to meet with Keystone in person to discuss the termination. *Id.* If, after this meeting, JGB still desires to terminate, the contract will be cancelled ninety days after the meeting. *Id.*

Two ambiguities exist regarding the early termination process. The first ambiguity arises from the absence of a designation indicating the date on which the 365–day timeline begins. Agreement, 10/7/07, at 1. If the timeline began on the effective date of the Agreement, which itself was not explicitly identified because the parties did not enter it in paragraph four, the earliest date on which early termination could occur was October 29, 2008.[4] Agreement, 10/7/07, at 1. If the timeline began on the date of carrier selection, March 11, 2008,

however, the date of early termination was March 11, 2009. *Id.*

The second ambiguity arises from the unclear language regarding when the ninety-day post-meeting waiting period began. If the waiting period did not begin until after 365 days of the Agreement, termination could occur, at the earliest, after 455 days of the Agreement regardless of when the termination meeting took place. If the waiting period began immediately after the termination meeting, however, termination could occur after 365 days, provided the meeting took place ninety or more days earlier, *i.e.,* on day 275 or earlier. *See* Agreement, 10/7/07, at 1.

Again, the record demonstrates that there was conflicting parol evidence presented at trial that was properly left to the jury to resolve. Regarding the first ambiguity, JGB presented testimony that the parties intended the 365–day timeline to begin on the original date of signing, October 30, 2007, an understanding that Keystone did not correct. N.T., 12/1–2/11, Vol. II, at 373–374. Keystone alternatively presented testimony that the parties intended the timeline to begin on the date on which the parties selected a carrier, which was March 11, 2008. N.T., 12/1–2/11, Vol. I, at 109–110.

Regarding the second ambiguity, JGB demonstrated that the Agreement placed no restriction on the time of the meeting, evidenced by the fact that Keystone requested that the meeting take place *via* conference call, which it hosted on July 22, 2008; the waiting period began to run

4. The Agreement includes the "365 days" statement to clarify the timeline. Since 2008 was a leap year, the correct date is October 29, 2008. Agreement, 10/7/07, at 1. Interpreting the Agreement otherwise would nullify the "365 days" language. *See Trombetta v. Raymond James Financial Services, Inc.,* 907 A.2d 550, 560 (Pa.Super.2006) ("Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the same agreement. Furthermore, the specific controls the general when interpreting a contract.") (internal citations omitted). JGB, however, in its termination notice, stated its intention to terminate on October 30, 2008, and it will be held to that date. N.T., 12/1–2/11, at 386.

after the conference call. N.T., 12/1–2/11, Vol. II, at 370–374. Keystone alternatively asserted through testimony that the Agreement could not be cancelled until fifteen months after the Agreement began in light of the waiting period. N.T., 12/1–2/11, Vol. I, at 245–248.

The jury resolved both of these ambiguities in JGB's favor,[5] and, unlike JGB's attempt to terminate under the General Termination Clause, its termination under the Early Termination Clause was effective. First, JGB sent written notice to Keystone via e-mail, which was assented to by Keystone. N.T., 12/1–2/11, Vol. I, at 105. Second, JGB provided an opportunity for Keystone to meet with its representatives in person, and Keystone instead requested that the meeting take place by conference call. *Id.* After the conference call, JGB sent a follow-up e-mail clearly communicating its intent to terminate the contract on October 30, 2008. N.T., 12/1–2/11, Vol. II, at 386. The termination, therefore, was clear and unambiguous as required under *International Diamond Importers*, 40 A.3d at 1271.

■ Although JGB effectively terminated the contract under the Early Termination Clause, Keystone is not precluded from receiving compensatory damages for services rendered between July 22, 2008 and October 30, 2008, for which it was not paid. The question to be resolved by the jury was whether Keystone rendered any services between those dates where JGB changed shipping providers immediately following the July 22, 2008 termination meeting. If JGB was benefitting from the rates which Keystone secured on JGB's behalf, Keystone was rendering services and is owed compensation for JGB's savings. If, however, JGB was receiving the rates it was receiving prior to Keystone's involvement, an assertion by JGB called into question by UPS Freight invoices, Keystone was not rendering services because JGB was not receiving any savings. While the jury attempted to resolve this question at trial, its findings were based on evidence which JGB challenged below and challenges on appeal.

At trial, JGB objected to the admission of UPS Freight invoices reflecting charges to JGB. N.T., 12/1–2/11, Vol. I, at 208–219. The invoices were offered into evidence during the testimony of Keystone's Vice President of Operations, Richard Coyner. JGB requested an offer of proof, to which Keystone responded that Mr. Coyner's testimony would be based upon his analysis of UPS third-party invoices that had been submitted to JGB over a four-year period and were provided to Keystone by JGB during discovery. *Id,* at 207. JGB objected on the basis that the invoices were not authenticated and were "classic hearsay" to which no exception applied. *Id.* at 208–209. JGB also objected to the testimony of Mr. Coyner and the admis-

---

5. The jury apparently found that the date on which the timeline began was the date of signing, October 30, 2007, and that the waiting period began after the date of the termination meeting, July 22, 2008. *See* Verdict Sheet, 12/2/11, at 1. Under this interpretation, the waiting period expired October 20, 2008, and JGB, therefore, was free to terminate the Agreement on October 29, 2008, and did so on October 30, 2008. N.T., 12/1–2/11, Vol. II, at 386. Although the record does not include the exhibits from which the jury calculated damages, the notes of testimony provide that JGB saved $235,159.66 from the attempted date of termination, July 22, 2008, to the end of the year. N.T., 12/1–2/11, Vol. I, at 242. If this number is divided in half to reflect the split in savings between JGB and Keystone and then prorated for the number of days between July 22, 2008 and October 30, 2008, the estimated damages total $72,580.14. Since the jury awarded $70,000 in damages, it is evident that the jury resolved the ambiguities in JGB's favor. Verdict Sheet, 12/2/11, at 1.

sion of his demonstrative exhibit because they were based on the improperly admitted invoices. *Id,* at 208–219, 237–240. The trial court admitted the invoices and testimony over these objections. *Id.*

JGB maintains its position on appeal, submitting that the trial court improperly admitted unauthenticated UPS Freight invoices. It suggests that if the trial court properly had ruled that the invoices were inadmissible due to a lack of proper authentication, Keystone would have lacked any proof of its alleged damages. JGB's Brief at 19. JGB also asserts that "information contained in the UPS invoices was hearsay" and, therefore, inadmissible. *Id,* at 20. JGB suggests that since no hearsay exception applied, Mr. Coyner's testimony and exhibit, being based entirely on hearsay evidence, should not have been admitted. JGB's Brief at 20–23.

Keystone responds that the trial court did not abuse its discretion in admitting the evidence where the documents were produced to it by JGB in discovery and because other witnesses could have been called to authenticate them. Keystone's Brief at 12. Keystone posits, "The Court recognized that this cumbersome process was not necessary, and properly allowed the documents into evidence." *Id.* at 13.

Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. *Commonwealth Financial Systems, Inc. v. Smith,* 15 A.3d 492, 496 (Pa.Super.2011) (citing *Stumpf v. Nye,* 950 A.2d 1032, 1035–1036 (Pa.Super.2008)). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1046 (2003).

We examine the authentication of the invoices that were submitted at trial. Rule 901 of the Pennsylvania Rules of Evidence provides, in pertinent part:

**Rule 901. Authenticating or Identifying Evidence**

**(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

**(b) Examples.** The following are examples only—not a complete list—of evidence that satisfies the requirement:

(1) *Testimony of a Witness with Knowledge.* Testimony that an item is what it is claimed to be.

\* \* \*

(4) *Distinctive Characteristics and the Like.* The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

Pa.R.E. 901 (emphasis in original).

In response to JGB's claim that the freight invoices were not properly authenticated, the trial court determined that the documents were properly admitted into evidence merely because JGB had provided them during discovery, suggesting in its Pa.R.A.P. 1925(a) opinion that Keystone had "every right to rely upon JGB's representations when it responds to a discovery request by referencing documents that it makes available for inspection and copying. . . ." Trial Court Opinion, 5/18/12, at 6. Such a conclusion ignores that the discovery of documents and proof of their reliability at trial are two different matters.

■ Rules relating to discovery generally are present to prevent surprise and unfairness and "to allow a fair trial on the merits." *McGovern v. Hospital Service Ass'n of Northeastern Pennsylvania,* 785 A.2d 1012, 1015 (Pa.Super.2001) (quoting *Dominick v. Hanson,* 753 A.2d 824, 826 (Pa.Super.2000)). Significantly, however, the purpose of discovery "is to enable the party seeking it to make out his cause of action or his defense.... The matters about which inquiry is made must bear pertinently upon the matters **which he will be required to prove affirmatively at trial.**" *Peoples City Bank v. John Hancock Mut. Life Ins. Co.,* 353 Pa. 123, 44 A.2d 514, 517 (1945) (emphasis added). It is this very concept that the trial court confused and ignored. Keystone was entitled to discover the freight invoices, but their significance at trial was dependent upon Keystone's ability to utilize them properly in the claim it sought to prove. As this Court stated in *Commonwealth v. Haber,* 351 Pa.Super. 79, 505 A.2d 273, 276 (1986), "Evidentiary rules ... have a 'raison d'etre.' Experience has taught us that trials conducted in accordance with such rules increase the likelihood of a fair and just resolution of the issues by the trier of fact."

In the case *sub judice,* we conclude that the trial court abused its discretion in ruling that the freight invoices were properly authenticated. As noted above, for a document to be admissible into evidence at trial, it must first be authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). *See Zuk v. Zuk,* 55 A.3d 102, 112 (Pa.Super.2012) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

In this case, freight invoices were offered into evidence during the testimony of Keystone Vice President of Operations, Richard Coyner. In chambers, prior to Mr. Coyner's testimony, JGB requested an offer of proof, and Keystone responded that Mr. Coyner's testimony would be based on his analysis of the invoices submitted by UPS to JGB that were provided to Keystone during discovery. N.T., 12/1–2/11, Vol. I, at 207. JGB objected to their admission because they were not properly authenticated, and they constituted inadmissible hearsay. *Id.* at 208–209.

Clearly, as the invoices were prepared by UPS and received by JGB, Mr. Coyner, as a vice president of Keystone, lacked any personal knowledge that the invoices were what they were represented to be. Undeniably, Keystone could have admitted them into evidence through the testimony of a relevant UPS witness. Keystone makes a hollow representation that it could have presented the testimony of JGB manager, Randall Tomasino, and JGB owner, Jay Bernhardt, to authenticate the invoices, without making any proffer on the content of their potential testimony. The fact remains that Keystone chose not to call any authenticating witness. The invoices were not authenticated at trial, and the trial court abused its discretion in permitting their admission.

■ Authentication, however, is not the only factor to assess regarding the admission of the invoices. JGB also contends that the UPS invoices were hearsay, no exception applied, and they therefore were inadmissible. Hearsay is defined as "an extra judicial declaration offered to prove the truth of the matter asserted." *Aldridge v. Edmunds,* 561 Pa. 323, 750 A.2d 292, 296 (2000); Pa.R.E. 801(c). A document itself qualifies as hearsay when it contains such hearsay statements. *See, e.g., Rissi v. Cappella,* 918 A.2d 131, 138–

139 (Pa.Super.2007) ("[T]he document was clearly hearsay."). Anything qualifying as hearsay is inadmissible as evidence unless an exception applies. Pa.R.E. 802.

In objecting to the admission of the invoices, JGB underscored that the invoices were "not a business record," and "[n]obody is here to authenticate the documents." N.T., 12/1–2/11, Vol. I, at 209. The trial court merely rejected the challenges in conclusory fashion, stating, "[As] to the authenticity issue, I'm not sure how you establish authenticity in the absence of a stipulation." *Id.* Very little was discussed regarding the alleged hearsay of the documents, and the trial court ruled them admissible based only upon the fact that JGB had produced them in discovery. The trial court utilized an estoppel analysis of sorts, asserting that Keystone had "every right" to conclude the invoices were "what JGB purport[ed] them to be." Trial Court Opinion, 5/18/12, at 6.

The business records exception is found in Pa.R.E. 803, which provides, in pertinent part:

**Rule 803. Exception to the Rule Against Hearsay Regardless of Whether the Declarant is Available as a Witness**

\* \* \*

■ **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,

  (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

  (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

  (C) making the record was a regular practice of that activity;

  (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

  (E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). While a qualified witness need not have personal knowledge, the individual must be able to "provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness...." *Boyle v. Steiman,* 429 Pa.Super. 1, 631 A.2d 1025, 1032 (1993).

We find guidance in this Court's recent decision in *Commonwealth Financial Systems, Inc. v. Smith,* 15 A.3d 492, 499 (Pa.Super.2011). Therein, the appellant, Commonwealth Financial Systems, purchased the appellee's debt to Citibank from NCOP Capital. *Id.* at 493–494. To verify the transfer of debt ownership, the appellant attempted to admit records of business transactions between Citibank and NCOP Capital, both separate entities from the appellant, through the testimony of its own vice president of portfolio collection. *Id.* at 494. The trial court denied admission, finding the documents to be improperly authenticated under the business records exception to the rule against hearsay, Pa.R.E. 803(6). *Id.* at 495. This Court affirmed, holding that the appellant's vice president of portfolio collection did not have sufficient knowledge of the records and could not establish the documents' trustworthiness. *Id.* at 499–500.

In the present case, Keystone attempted to admit hearsay evidence in a similar manner. Using the testimony of its vice president of operations, Mr. Coyner, Keystone attempted to verify the authenticity and trustworthiness of the invoices made between two other businesses. N.T., 12/1–2/11, Vol. I, at 208–219. Unlike in *Smith*, however, Keystone had the opportunity to verify the invoices, arguably through the testimony of JGB's own employees, but it wholly failed to do so.

Herein, the invoices from UPS Freight to JGB qualify as hearsay. They contain out-of-court statements regarding the cost of freight charged to JGB, and Keystone offered the invoices to prove those freight charges. As outlined above, the business record exception may have applied if Keystone were able to meet all of the factors. Keystone, however, failed to bring a custodian or other qualified witness to testify. Instead, it presented Richard Coyner to testify regarding their contents. He did not attempt to testify to the preparation or maintenance of the records; indeed, he did not have the necessary knowledge to do so. This Court has repeatedly emphasized that there is a need for trustworthiness in applying the business record exception. *See, e.g., Birt v. Firstenergy Corp.*, 891 A.2d 1281 (Pa.Super.2006). The business records exception is inapplicable, and the invoices were inadmissible hearsay.

As the invoices are hearsay for which no other exception is asserted, and no other exception applies, Mr. Coyner's testimony and his demonstrative exhibit, which both were based on the invoices, also qualify as hearsay. *See, e.g., Commonwealth v. Robertson*, 874 A.2d 1200, 1210 (Pa.Super.2005) (holding that testimony based on hearsay is hearsay). This evidence was the only evidence on which the jury could have based its damages calculation. The trial court clearly abused its discretion in allowing its admission.

For the foregoing reasons, we are constrained to vacate the judgment and remand for a new trial, limited to damages, consistent with this Opinion.

Judgment vacated. Case remanded. Jurisdiction relinquished.