J-S33016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: F.W., MOTHER | : | No. 1502 EDA 2022 |

Appeal from the Order Entered May 16, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0001245-2021

BEFORE:  KUNSELMAN, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY KING, J.:                    **FILED NOVEMBER 8, 2022**

Appellant, F.W. ("Mother"), appeals from the order entered in the Philadelphia County Court of Common Pleas, which adjudicated her minor child, A.B. ("Child") dependent.  We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> The Philadelphia Department of Human Services ("DHS") first became aware of this family on September 9, 2021, when DHS received a Child Protective Services ("CPS") report alleging that [Child] had been sexually abused for several years by Mother's paramour.  The CPS report alleged that the most recent incident of sexual abuse occurred in June 2021.  The report further alleged that Mother did not believe the allegations.
>
> On September 9, 2021, [Child] had a forensic interview with Philadelphia Children's Alliance ("PCA").  In the interview, [Child] confirmed that Mother's paramour sexually abused her from 2013 until 2020.  [Child] stated that she informed Mother about the abuse on several occasions.  When DHS

visited Mother's home on September 10, 2021, Mother and her paramour denied the allegations in the CPS report. When DHS filed its dependency petition on December 23, 2021, Mother continued to reside with her paramour.

[Child] was initially placed with her father in Pottstown, PA, but DHS learned that Father later left [Child] at her paternal grandmother's house. DHS implemented a safety plan in paternal grandmother's home in which [Child] was not to return to the home where Mother and her paramour resided. The safety plan also stated that any communication between [Child] and Mother was to be monitored.

On November 18, 2021, [Child's] paternal grandmother informed DHS that she was unable to care for [Child] on a long-term basis. On December 6, 2021, DHS identified an appropriate placement for [Child]. On that date, DHS obtained an order of protective custody ("OPC") for [Child] and placed her with the identified caregiver. At the December 8, 2021 shelter care hearing, the OPC was lifted and the temporary commitment to DHS was ordered to stand. [Child] was referred to Behavioral Health Services ("BHS") for an evaluation.

At the February 2, 2022 hearing, which was continued, [the trial c]ourt learned that [Child] was absent without leave ("AWOL"). [The trial c]ourt deferred [Child's] adjudication and ordered a private investigator ("PI") to be hired. The court also ordered a missing person's report to be filed and for the missing persons protocol to be followed.

On May 16, 2022, [the trial c]ourt held an adjudicatory hearing for [Child]. At the beginning of the hearing, Mother's counsel requested that [the c]ourt discharge [Child's] case because of the child's AWOL status. Prior to making a determination regarding Mother's request, [the c]ourt heard testimony from the Community Umbrella Agency ("CUA") case manager, Mr. Davon Dixon, regarding the Child's AWOL [status]. Mr. Dixon testified that he was assigned to this case in December 2021. He stated that [Child] went AWOL on January 7, 2022. Mr. Dixon further testified that a police report was filed, the Center for Missing and Exploited Children was notified, and an on-grounds PI search was conducted. Mr. Dixon further stated that the PI

was unable to locate [Child]. Additionally, Mr. Dixon conducted unannounced visits at Mother's home, but did not see the child there. Mr. Dixon testified that he spoke to Mother about the child's whereabouts, but Mother stated she "has no idea where she could be." On cross-examination by the child advocate, Mr. Dixon testified that [Child] has not attended school since January 2022. Mr. Dixon stated that he had been unable to communicate with [Child's] previous kinship parents from whose home [Child] went AWOL. Mr. Dixon further testified that he has never met the child.

Counsel for DHS also called DHS Investigator, Ms. Jocelyn Childs, to testify regarding [Child's] AWOL [status]. Ms. Childs testified that the last time she saw [Child] was on January 7, 2022. On that date, she attempted to locate a new foster placement for [Child] after her kinship placement failed. Ms. Childs testified that [Child] packed, she assisted [Child] with putting her belongings in the car, but [Child] refused to get in the vehicle. A police report for [Child] was filed that same day. Ms. Childs further testified that at some point between January 7, 2022 and January 12, 2022, she received a phone call from [Child's] previous kinship parent stating that [Child] still shared her iPhone location with her. The last location that the kinship parent reported for [Child's] iPhone was at Mother's home. Ms. Childs further testified that the kinship parent sent a screenshot of [Child's] iPhone location to her, which she also shared with CUA and the assigned PI.

After hearing the testimony presented, [the trial c]ourt denied Mother's request to discharge [Child's] case and proceeded with the adjudicatory hearing. Counsel for DHS called Ms. Jocelyn Childs to testify again. Ms. Childs testified that she was the assigned DHS investigator for the CPS report involving this family. She testified that on September 9, 2021, DHS received a CPS report alleging that [Child] was sexually abused by Mother's paramour. The allegations in the CPS report were that Mother's paramour sexually assaulted [Child] by placing his penis in her mouth and vagina. [Child] was the victim child named in the CPS report and Mother's paramour was the alleged perpetrator.

Prior to Ms. Childs receiving this investigation, [Child] was

interviewed by [PCA] about the allegations in the CPS report. During the PCA interview, Ms. Childs testified that [Child] disclosed that she had been sexually abused by Mother's paramour.

During her investigation, Ms. Childs spoke with Mother, Mother's paramour, the child, and Father. When Ms. Childs received the investigation, she conducted an unannounced visit at Mother's home to determine if Mother's paramour was there. She testified that Mother's paramour answered the door and identified himself. When Ms. Childs spoke to Mother, she informed her of the allegations in the CPS report. Ms. Childs testified that Mother stated that she did not know why the child would make up or lie about the allegations. Mother stated to Ms. Childs that she believed [Child] made the disclosure to avoid getting into trouble for previously running away from home. Mother's paramour denied the allegations in the CPS report. When Ms. Childs concluded her investigation, Mother's paramour continued to reside in the home with Mother.

When Ms. Childs interviewed [Child], [Child] made a disclosure about being sexually assaulted by Mother's paramour. However, [Child] then attempted to recant the disclosures she made in the PCA interview and minimize the allegations. Ms. Childs stated that [Child] recanted the part of the PCA interview in which she disclosed that Mother's paramour sexually assaulted her. [Child] stated to Ms. Childs that Mother's paramour attempted to sexually assault her, but then [Child's] brother walked into the room, and Mother's paramour did not actually assault her. Ms. Childs went to the paternal grandmother's home to interview [Child]. Before Ms. Childs mentioned the sexual assault allegations, [Child] immediately stated, "Everything I said before didn't happen." When Ms. Childs asked for clarification regarding [Child's] statement, she stated that Mother's paramour did not have sex with her, but rather "just tried to."

When the DHS investigation concluded, the CPS report was indicated for sexual abuse. Ms. Childs testified that the CPS report was indicated because [Child] made an initial full disclosure at an emergency forensic interview with PCA. Ms. Childs stated that she maintains the DHS file and had an

- 4 -

opportunity to review the file. [Child] also made a full disclosure when she was interviewed alone by the DHS hotline social worker. This disclosure was consistent with the allegations in the CPS report. In the disclosure to the hotline social worker, [Child] stated Mother's paramour sexually abused her on more than one occasion. Additionally, [Child] disclosed to the hotline social worker that she and her brother told Mother about the sexual abuse, but that Mother did not believe her.

Ms. Childs testified that she did not believe [Child's] recantation of the sexual abuse was credible. On cross-examination by the child advocate, Ms. Childs stated that [Child's] kinship parent was concerned that [Child] was having inappropriate and unsupervised phone contact with Mother. There were also concerns regarding Mother allegedly attempting to provide [Child] with money, gifts, and promises to go shopping if she recanted.

(Trial Court Opinion, filed 7/7/22, at 1-6) (internal record citations and some capitalization omitted).

By order entered May 16, 2022, the court adjudicated Child dependent and transferred legal custody to DHS. The court also indicated that Child's placement goal was to return to Mother. Mother timely filed a notice of appeal on June 13, 2022. The notice of appeal included a concise statement of errors complained of on appeal.

Mother now raises four issues for our review:

Did the trial court violate Mother's due process rights under state and federal law by admitting hearsay statements that were not subject to cross-examination?

Did the trial court err in law or abuse its discretion when it admitted the hearsay testimony for the truth of the matter?

Did the trial court err in law or abuse its discretion and lacked personal jurisdiction when it adjudicated a child that

was AWOL and not present and the child was not served to be present at the hearing?

Did the trial court err in law or abuse its discretion when it adjudicated that child without clear and convincing evidence?

(Mother's Brief at 5).

In her first two issues, Mother contends that DHS submitted improper hearsay evidence to support its contention that Mother's paramour sexually abused Child. Specifically, Mother claims that Ms. Childs "had no personal knowledge [of the abuse] and all her statements testified to in court were from other individuals and reports." (*Id.* at 9). Mother also complains that "Child was not present to be cross-examined as to the statements she made," and "DHS had the burden to call the child, the father, PCA interviewer, and the hotline worker who had personal knowledge about [the] case." (*Id.* at 9-10)

Mother recognizes that there are exceptions to the general prohibition against hearsay evidence, and she acknowledges that the trial court relied on the "business records" exception set forth in Pa.R.E. 803(6). Mother insists, however, that the exception requires a witness with personal knowledge of the business records to authenticate the documents. Mother maintains that Ms. Childs lacked such personal knowledge because she "did not create these records during her normal course of business." (*Id.* at 11). Under these circumstances, Mother concludes that the trial court erred by admitting impermissible hearsay evidence that could not satisfy the "clear and

convincing" standard required to support Child's adjudication. We disagree.

"The admission of evidence is within the discretion of the trial court and such decisions will be reversed only if the trial court has abused its discretion." ***Interest of I.R.-R.***, 208 A.3d 514, 519 (Pa.Super. 2019) (quoting ***In re Adoption of R.K.Y.***, 72 A.3d 669, 675 (Pa.Super. 2013)). "The Rules of Juvenile Court Procedure provide that in adjudications, each party shall have an opportunity to present evidence subject to the rules of evidence." ***Id.*** (citing Pa.R.J.C.P. 1406(C), cmt.)

"'[H]earsay is defined as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted." ***Adams v. Rising Sun Medical Center***, 257 A.3d 26, 35 (Pa.Super. 2020), *appeal denied*, ___ Pa. ___, 263 A.3d 246 (2021). "Generally, hearsay is inadmissible because it is deemed untrustworthy since it was not given under oath and subject to cross-examination." ***Id.*** Nevertheless, the Pennsylvania Rules of Evidence provide an exception to the general rule prohibiting hearsay for certain types of business records:

> **Rule 803. Exceptions to the Rule Against Hearsay— Regardless of Whether the Declarant is Available as a Witness**
>
> \* \* \*
>
> **(6)    Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
>     (A)    the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B)   the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C)   making the record was a regular practice of that activity;

(D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)   the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6).   "In regard to the business records exception, the circumstantial trustworthiness arises from the regularity with which business records are kept and the reliance that businesses place on the accuracy of those records." ***Bayview Loan Servicing LLC v. Wicker***, 651 Pa. 545, 560, 206 A.3d 474, 483 (2019).

This exception has been incorporated into Pennsylvania law through the Uniform Business Records as Evidence Act ("the Act"), which states:

> A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S.A. § 6108(b).   "The Act and the Rule substantially overlap in that

both generally require that a custodian or other qualified witness testify that the record was made 'at or near the time' of the event recorded and that the record was kept in the regular course of business." ***Bayview Loan Servicing, supra*** at 560, 206 A.3d at 483 (internal footnote omitted).

Regarding the requirement of testimony from a custodian or qualified witness, our Supreme Court has recognized:

> Quite often different individuals have personal knowledge of the various phases of a transaction so that no one individual has knowledge of the entire transaction. In addition, the frequent turnover of personnel often makes it impossible to identify the employee—if it were only one—who took part in the transaction. Under these circumstances, to require the entrant to have personal knowledge of the event recorded, and to require proof of the identity of the recorder, would exclude almost all evidence concerning the activities of large business organizations—a result diametrically opposed to the purpose and spirit of the Business Records as Evidence Act.

***Id.*** at 561, 206 A.3d at 483-84 (quoting ***Fauceglia v. Harry***, 409 Pa. 155, 158-59, 185 A.2d 598, 600 (1962)). "While a qualified witness need not have personal knowledge, the individual must be able to 'provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness….'" ***Carlini v. Glenn O. Hawbaker, Inc.***, 219 A.3d 629, 641 (Pa.Super. 2019) (quoting ***Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.***, 77 A.3d 1, 13 (Pa.Super. 2013)). Thus, "the import of the Act is to require that the basic integrity of the record-keeping is established," and "as long as someone in the organization has personally observed the event recorded, the evidence should be admitted."

*Bayview Loan Servicing, supra* at 562, 206 A.3d at 484 (internal quotation marks omitted).

Instantly, DHS presented testimony from Ms. Childs, the social worker who investigated Child's circumstances. Ms. Childs explained that DHS received a CPS report alleging that Mother's paramour, A.O., sexually abused Child. (*See* N.T. Hearing, 5/16/22, at 18-19; DHS's Exhibit 2, CPS Report, dated 9/9/21). Initially, a DHS hotline worker contacted Child "and implemented a safety plan." (N.T. Hearing at 20). Thereafter, Ms. Childs contacted Mother and A.O. at the family home. Mother told Ms. Childs that she did not believe Child's allegations against A.O., and Mother felt that Child fabricated the allegations "to avoid getting into trouble because she had recently ran away and gotten into trouble for it." (*Id.* at 21).

Ms. Childs began to testify about Child's forensic interview at PCA, and Mother's counsel objected. The thrust of this objection was that DHS was not presenting the PCA employee who was "the actual interviewer." (*Id.*) The court overruled the objection and permitted Ms. Childs to continue. DHS's attorney then asked Ms. Childs about her subsequent interview of Child. Again, Mother's counsel objected and argued that "[t]he child's not here and it's hearsay, anything that she has said to the child is hearsay." (*Id.* at 21-22). The court also overruled this objection, and Ms. Childs continued to testify about her interview of Child.

After this line of questioning, DHS entered its investigation report into

- 10 -

evidence. (**Id.** at 25; DHS's Exhibit 3, Form CY48, dated 10/8/21). Mother's counsel objected to this report because "the actual investigator is not present." (N.T. Hearing at 25). The court quickly corrected counsel, informing her that Ms. Childs was the investigator. (**Id.** at 26). The court also overruled the objection. Ms. Childs concluded her testimony by stating that she maintained the DHS case file while conducting the investigation, and she had an opportunity to review the file. As part of that review, she studied the notes from Child's prior interviews.

In defense of its evidentiary rulings, the court noted:

> DHS properly laid the foundation for the admissibility of Ms. Childs's testimony regarding [Child's] PCA interview as well as the statements [Child] made to Ms. Childs during her investigation. Ms. Childs testified that she was the DHS investigator assigned to conduct the DHS investigation of the allegations in the CPS report. Ms. Childs interviewed the child as a normal part of her DHS investigation. Ms. Childs further testified that she maintains the DHS file for this case and had the opportunity to review the file. The statements that [Child] made to Ms. Childs were given during the normal course of Ms. Childs's investigation, thus [the trial c]ourt found the statements relevant and admissible under Pa.R.E. 803(6). The CPS report which Ms. Childs was assigned to investigate was filed based on the disclosure of sexual abuse that [Child] made during her PCA interview. These statements formed the basis of the DHS investigation and are relevant and admissible in the Adjudicatory Hearing. Additionally, in a disposition hearing, all evidence that is helpful in determining the questions presented may be considered by the court to the extent of its probative value. 42 Pa.C.S.A. § 6341(d).

(Trial Court Opinion at 17). Here, we agree that Ms. Childs provided sufficient information relating to the preparation and maintenance of the reports to

justify a presumption of trustworthiness. ***See Carlini, supra***.

Moreover, we disagree with Mother's argument that Ms. Childs lacked personal knowledge to justify the admission of the records under Rule 803(6). Contrary to Mother's assertions, the DHS employee who oversees the investigation into child abuse allegations is uniquely suited to comment on the preparation and maintenance of the reports in the investigation file. ***See*** 42 Pa.C.S.A. § 6108(b). On this record, we conclude that the court did not abuse its discretion with its evidentiary rulings. ***See Interest of I.R.-R., supra***. Accordingly, Mother is not entitled to relief on her first two issues.

In her third issue, Mother argues that dependency courts "must have personal jurisdiction by serving the parties with a summons." (Mother's Brief at 12). In light of DHS's inability to locate Child, Mother maintains that the court lacked personal jurisdiction in this case. Mother also insists that she did not waive this issue where her "counsel objected to the hearing going forward and requested that the petition be discharged because the child had been AWOL … and she was [unavailable] to cross-examine." (***Id.***) Mother concludes that the trial court lacked personal jurisdiction when it adjudicated Child dependent. Mother's issue is waived.

"Personal jurisdiction is [a] court's power to bring a person into its adjudicative process[.] Moreover, personal jurisdiction is readily waivable." ***Grimm v. Grimm***, 149 A.3d 77, 83 (Pa.Super. 2016), *appeal denied*, 641 Pa. 592, 169 A.3d 25 (2017) (internal citations and quotation marks omitted).

Under the Juvenile Act, attendance at and participation in dependency proceedings are restricted. Dependency hearings are closed to the general public. Only a "party" has the right to participate, to be heard on his or her own behalf, to introduce evidence, and/or to cross-examine witnesses. Although the Juvenile Act does not define "party," case law from this Court has conferred the status of party to a dependency proceeding on three classes of persons: (1) the parents of the juvenile whose dependency status is at issue; (2) the legal custodian of the juvenile whose dependency status is at issue, or (3) the person whose care and control of the juvenile is in question. These categories logically stem from the fact that upon an adjudication of dependency, the court has the authority to remove a child from the custody of his or her parents or legal custodian. Due process requires that the child's legal caregiver, be it a parent or other custodian, be granted party status in order to be able to participate and present argument in the dependency proceedings.

*In re L.C., II*, 900 A.2d 378, 381 (Pa.Super. 2006) (internal citations omitted).

After a dependency petition is filed, the court "shall direct the issuance of a summons to the parents, guardian, or other custodian, a guardian *ad litem*, and any other persons as appear to the court to be proper or necessary parties to the proceeding, requiring them to appear before the court…." 42 Pa.C.S.A. § 6335(a). "The summons shall also be directed to the child if [she] is 14 or more years of age…." *Id.* Nevertheless, our Rules of Juvenile Court Procedure recognize certain situations when a child need not be present:

**Rule 1128. Presence at Proceedings**

**A. General Rule.** All parties, including the child, shall be present at any proceeding unless the exceptions of paragraph (B) apply.

**B. Exceptions.**

(1) *Absence from Proceedings.* The court may proceed in the absence of a party upon good cause shown except that in no case shall a hearing occur in the absence of a child's attorney. If a child has a guardian *ad litem* and legal counsel, both attorneys shall be present.

(2) *Exclusion from Proceedings.* A party may be excluded from a proceeding only for good cause shown. If a party is so excluded, counsel for the party shall be permitted to be present.

Pa.R.J.C.P. 1128(A), (B).

Instantly, at the start of the adjudication hearing, Mother's counsel made the following statement:

Your Honor, this case has been open since December and the child is still AWOL. My client has cooperated with the investigation. They still have not been able to identify where the child is located, and I'm requesting that the case be discharged.

(N.T. Hearing at 7).

Although Mother now argues that counsel's generic request for discharge preserved her specific claim related to personal jurisdiction, the court disagreed:

At [Child's] adjudicatory hearing, Mother's counsel did not raise any objection regarding the child not being served or given notice of the adjudicatory hearing. Additionally, Mother's counsel did not raise any objection at the adjudicatory hearing regarding [the trial c]ourt's personal jurisdiction over [Child] given her AWOL status. Mother's counsel appeared before [the trial c]ourt in this matter on numerous occasions and failed to raise objections to the child's lack of notice and service or [the c]ourt's personal jurisdiction over the child.

- 14 -

(Trial Court Opinion at 11) (some capitalization omitted).

Based upon our review of the record, the court correctly determined that Mother did not preserve her claim regarding personal jurisdiction. *See PCS Chadaga v. Torres*, 252 A.3d 1154 (Pa.Super. 2021) (reiterating that party must make specific objection to alleged error before trial court in timely fashion and at appropriate stage of proceedings to preserve claim of error for appellate review; failure to raise such objection results in waiver of underlying issue on appeal). Even if Mother had not waived her claim, the court properly concluded that it could proceed without Child based upon the demonstration of "good cause."[1] *See* Pa.R.J.C.P. 1128(B)(1). Accordingly, Mother is not entitled to relief on her third issue.

In her fourth issue, Mother contends that the court's ruling was "based on inadmissible hearsay" evidence because Child was not available to testify. (Mother's Brief at 13). Mother insists that she provided for all of Child's needs and, aside from the abuse allegations, "there were no other dependency issues in the home." (*Id.* at 15). Mother posits that Child may have "mental health and/or behavioral issues that may not be identified," and that these are the real cause of the family's problems. (*Id.*) Absent more, Mother concludes that DHS did not provide clear and convincing evidence to support the adjudication. We disagree.

---

[1] We note that Child's attorney/guardian *ad litem* attended the hearing. (*See* N.T. Hearing at 6).

The applicable scope and standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

> We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000).

The Juvenile Act defines a dependent child, in pertinent part, as follows:

**§ 6302.  Definitions**

\* \* \*

**"Dependent child."**  A child who:

(1)   is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his [or her] physical, mental, or emotional health, or morals.  A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

A court may adjudicate a child as dependent if the child meets the statutory definition of a dependent child by clear and convincing evidence. *In re E.B.*, 898 A.2d 1108, 1112 (Pa.Super. 2006). Additionally, "a finding of dependency can be made based on prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re R.W.J.*, 826 A.2d 10, 14 (Pa.Super. 2003). "The court must make a comprehensive inquiry into whether proper parental care is immediately available or what type of care [the parent] could provide in the future." *Id.*

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state.

*In re E.B., supra* at 1112.

Upon a finding of dependency, the court must focus on the child's best interests and order a disposition best suited to the child's safety and well-being. *In re S.B.*, 943 A.2d 973 (Pa.Super. 2008), *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). The court may not separate the child from the parent unless it finds that the separation is clearly necessary. *In re G.T.*, 845 A.2d 870 (Pa.Super. 2004). Such necessity is implicated where the child's welfare, safety, or health demands he or she be taken from his or her parent's custody. *Id.*; *In re R.W.J., supra*.

Instantly, the trial court concluded that DHS satisfied its burden and demonstrated that Child was without proper parental care and control. (**See** Trial Court Opinion at 9). After summarizing DHS's evidence, the court noted:

> The allegations in the indicated CPS report as well as Mother's position regarding the sexual abuse [Child] suffered greatly concern [the trial c]ourt. The evidence reflects Mother lacks the ability to provide adequate care and supervision for [Child] due to the sexual abuse [Child] suffered while in her care. The record reflects that [Child] and her brother informed Mother on numerous occasions that [Child] was sexually abused by Mother's paramour, but that she did not believe them. **Mother's refusal to believe [Child's] disclosure of sexual abuse as well as Mother continuing to allow her paramour to reside in the home with [Child] placed [Child's] safety and wellbeing at risk.**

(**Id.** at 10) (emphasis added). We agree with the court's analysis.

We also emphasize that the crux of Mother's appellate issue concerns the quality of the evidence supporting Child's sexual abuse allegations. The court, however, did not base its ruling on the allegations alone. Significantly, the court recognized that Mother's response to the allegations placed Child at risk. Thus, we cannot say that the court abused its discretion in adjudicating Child dependent. **See In re A.B., supra**. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2022