J-A19014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MICHELLE ROBINSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MERCY FITZGERALD HOSPITAL AND TRINITY HEALTH | : | |
| | : | No. 3498 EDA 2019 |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| BIANCA GREEN | : | |

Appeal from the Order Entered October 21, 2019
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  No. 170102249

BEFORE:  PANELLA, P.J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY PANELLA, P.J.:               **FILED JULY 07, 2021**

This appeal stems from a premises liability cause of action, after the appellee, Michelle Robinson, a wheelchair bound paraplegic, crashed onto the pavement at a parking lot while exiting her minivan that was fitted with a ramp. That parking lot was owned and managed by the appellants, Mercy Fitzgerald Hospital and Trinity Health (collectively, "the Hospital").[1] As a result

---

[1] Mercy Fitzgerald Hospital is part of the Trinity Health system. **See** N.T., 5/21/2019, at 60.

of the accident, Robinson broke her left tibia, suffered back pain and spasms, facial abrasions, in addition to aggravating a degenerative disc disease and lumbar stenosis. Robinson claimed the designated handicapped parking space area at issue was situated on a significant slope to allow for water drainage and therefore, created a dangerous condition for physically disabled individuals, including those wheelchair bound, to enter and exit their vehicles. The matter went to trial and the jury found in Robinson's favor in the amount of $473,888.76 for past and future economic losses and non-economic losses. On appeal, the Hospital raises several evidentiary challenges and seeks remittitur of damages. Based on the following, we affirm.

Robinson and her husband filed a complaint in January of 2017, and then amended complaints in February and March of that year, that were predicated on claims of negligence and premises liability. The Robinsons asserted the Hospital was negligent in its operation and maintenance of the parking areas on the hospital's property, which therein caused dangerous and unsafe conditions to exist. They specifically alleged that the parking spot at issue "was situated on a substantial and severe slope and angle that was [a] dangerous hazard and unsafe for physically disabled people including those confined to wheelchairs to get into and/or out of vehicles in the designated space without tipping over, falling and/or otherwise being injured." Second Amended Civil Action Complaint Premises Liability/General Negligence,

3/16/2017, at ¶ 15.[2] Bianca Green was joined as an additional defendant in the matter.[3] **See** Order, 3/12/2018. Pleadings and discovery were subsequently exchanged.

In May 2019, the parties filed numerous motions in limine. The Robinsons sought to preclude any reference or argument concerning the alleged negligence of Green. The Hospital sought to preclude the Robinsons from asserting any claims for economic damages related to past medical expenses and future medical expenses, violations of ADA and comparable Pennsylvania standards at the time of trial, and any reference to a heightened duty of care owed by hospitals.

On May 21, 2019, the court entered a series of orders addressing the parties' motions in limine. The court denied the Robinsons' motion regarding Green's negligence. The court granted the Hospital's motion in limine regarding a heightened duty of care and stated that the parties may reference the duties a possessor of land owed to a business invitee. The court denied the Hospital's motion as to past medical expenses and future medical expenses, stating the Robinsons' complaint was a premises liability action and the Hospital's joinder and cross-claim was a motor vehicle responsibility

_____

[2] Robinson's husband also brought forth a loss of consortium claim that was subsequently withdrawn at trial prior to jury deliberations.

[3] Green is not a party to this appeal.

- 3 -

action. Lastly, the court denied the Hospital's motion regarding the ADA and similar Pennsylvania standards.

The case proceeded to a jury trial on May 20, 2019. At trial, the Hospital did not dispute that Robinson suffered injuries due to the accident in the parking lot. Nor did the Hospital present any expert evidence that the parking spot where Robinson was injured was safe for wheelchair use. Instead, the trial centered on two major factual disputes: (1) whether Robinson's health aid, Bianca Green, was negligent for parking where she did, and (2) whether the future medical expenses claimed by Robinson are the result not of the instant accident, but of injuries suffered by Robinson prior to this incident.

On May 28, 2019, the jury returned a verdict in favor of Robinson in the amount of $473,888.76. The jury specifically allotted damages as follows: (1) $23,888.76 for past medical expenses; (2) $100,000 for future medical expenses; and (3) $350,000 for past, present, and future pain and suffering, embarrassment and humiliation, and loss of enjoyment of life. The jury also found the Hospital was 90% liable, Green was 7% liable, and Robinson was 3% comparatively negligent.[4]

_____

[4] The Hospital was deemed liable for the total amount of damages. Under the Fair Share Act, 42 Pa.C.S.A. § 7102, joint and several liability was abolished in most tort cases. However, the statute provides for several exceptions to this general rule, including where the defendant has been held liable for not less than 60% of the total liability apportioned to all parties. *See* 42 Pa.C.S.A. § 7102(a.1)(3)(iii). Because the Hospital was found to be 90% liable, it was joint and severally liable for the whole amount.

Robinson filed a post-trial motion to mold the verdict, alleging that because the Hospital's liability exceeded 60%, they were responsible for the entire verdict amount pursuant to 42 Pa.C.S.A. § 7102. Robinson also filed a post-trial motion for delay damages pursuant to Pa.R.C.P. 238. The Hospital also filed a post-trial motion, seeking a new trial on liability and damages or, in the alternative, granting a remittitur and reduction of the verdict.

On October 16, 2019, argument was held on the parties' motions. Five days later, the court entered an order denying the Hospital's motion for post-trial relief. That same day, the court entered a separate order granting Robinson's motions. The court then entered judgment in favor of Robinson and against the Hospital in the amount of $495,136.06. This timely appeal followed.[5]

The Hospital's four issues on appeal all challenge the trial court's denial of post-trial relief. Our review of a trial court's denial of a motion for post-trial relief is limited to an abuse of discretion or error of law:

> An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. If the alleged mistake concerned an error of law, we will scrutinize for legal error. On questions of law, our standard of review is *de novo* and our scope of review is plenary.

---

[5] On November 21, 2019, the trial court ordered the Hospital to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Hospital complied on December 12, 2019. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on January 6, 2020.

***Zaleppa v. Seiwell***, 9 A.3d 632, 635 (Pa. Super. 2010) (citations and quotation marks omitted). The first three of these issues challenge the court's denial of motions in limine seeking the exclusion of evidence at trial.

> [I]f the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining parties. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

***Ratti v. Wheeling Pittsburgh Steel Corp.***, 758 A.2d 695, 707 (Pa. Super. 2000) (citation omitted). We review challenges to the admissibility of evidence for an abuse of discretion:

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

***Keystone Dedicated Logistics, Inc. v. JGB Enterprises, Inc***., 77 A.3d 1, 11 (Pa. Super. 2013) (citations and internal quotation marks omitted).

In its first issue, the Hospital complains that the trial court erred and abused its discretion when it denied the Hospital's motion for a new trial. Specifically, the Hospital contends the court erred in denying its motion in limine "to preclude the [ADA] and Pennsylvania handicap parking spot requirements as they are not applicable to the pre-ADA constructed parking lot and are not standards, evidence, or proof of negligence in civil tort cases." Appellant's Brief, at unnumbered 3. The Hospital states that courts have

consistently held that a violation of an ADA regulation "may not be used as evidence of negligence *per se* in a personal injury action." ***Id.***

Moreover, relying on several federal district court and other state decisions, the Hospital asserts:

> A plaintiff may not 'borrow' ADA regulations for use as evidence of the standard of care to prove negligence *per se* in a personal injury action, since to do so would allow for recovery of damages for personal injuries for violations of the ADA, which are specifically not permitted under the ADA itself.

***Id.*** For example, the Hospital points to ***Lugo v. St. Nicholas Assoc.***, 18 A.D.3d 341, 795 N.Y.S.2d 227, 228 (N.Y.A.D. 2005) and ***Campbell v. Speedway LLC***, 225 F. Supp. 3d 663, 670 (E.D. Mich. 2016), for the notion that the ADA's purpose is to address issues of discrimination and not safety. ***See*** Appellant's Brief, at unnumbered 4; ***see also*** 42 U.S.C. § 12182(a) (ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation"). The Hospital maintains that because the trial court did not follow federal court precedent on the issue of the ADA, a federal law, it violated the Supremacy Clause of the United States Constitution. ***See*** Appellant's Brief, at unnumbered 4.

The Hospital further complains that the court's error "was compounded by permitting [Robinson]'s expert to testify and [Robinson]'s counsel to

question, argue and use the ADA slope measurements as evidence and proof of negligence, but precluded [defense counsel] from introducing the ADA provision regarding 'grandfathering' for pre-existing construction." *Id.*, at unnumbered 3. The Hospital states that no other explanation for the cause of Robinson's fall was presented through expert testimony other than the slope of the parking space was four times the recommendation in the ADA guidelines. *See id.*, at 5-6. The Hospital alleges that the plaintiff's expert "admitted he never even measured the actual parking spot [Robinson]'s van was parked in when she fell." *Id.*, at 6.

Additionally, the Hospital contends since the ADA was enacted in 1990 and therefore applies to all construction performed after that date, "any analysis of the dimensions of the subject parking space and the ADA requirements [was] irrelevant" because the parking lot at issue was constructed well before 1990. *Id.* The Hospital suggests Robinson's liability expert's analysis was irrelevant because the construction of the subject parking space predated the implementation of the ADA. *Id.*, at 7.

The Hospital also implies the court erred in refusing to consider its pre-existing construction argument because it was not presented with a case. The Hospital states that the issue is governed by the ADA itself and not case law. *See id.* The Hospital adds that even if Robinson were able to proceed under a theory of ADA violations, she would find no relief because compensatory damages are not available "absent a showing of intentional discrimination[,]"

and here, there was no evidence that the Hospital intentionally discriminated against Robinson. *Id.*, at 6.

Lastly, the Hospital concludes that the trial court's "error was further compounded" by its reliance on *Zito v. Merit Outlet Stores*, 647 A.2d 573 (Pa. Super. 1994). It states the "flaw" with "the trial court's reliance on *Zito*'s imposition of liability for a landowner's duty to anticipate when a business invitee's attention may be diverted or view obscured or obstructed, is that such a theory of liability was never introduced by [Robinson] during the trial or in post trial arguments." Appellant's Brief, at 8

Here, the trial court disposed of the Hospital's ADA arguments as follows:

> It is not clear what the basis of these arguments are because there are no discrimination issues in this litigation; no constitutional challenge in this litigation; and, no Federal Court precedents involved. This premises liability lawsuit did not involve construction of the parking lot. Rather, as established by all witnesses for all the parties, the issue is the painting of lines in the lot and posting the handicap sign to designate two handicap spaces over a storm drain.
>
> There are hundreds of parking spaces located on three levels of parking. The Hospital chose to place a sign at the location of the drain, and, to paint and re-paint the parking lot lines -- all within recent years whenever there is severe weather "all the time, year to year."

Memorandum in Support of Orders Denying Post-Trial Relief and Granting Delay Damages, 10/21/2019, at 15-16.

We agree with the court's rationale as the Hospital's arguments are flawed for several reasons. First, we note decisions of the federal district

courts and our sister states are not binding on courts of this Commonwealth, even when a federal question is involved. *See McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99 (Pa. Super. 2015); *Koken v. Reliance Ins. Co.*, 893 A.2d 70, 83 (Pa. 2006). Second, even if persuasive, the cases relied upon by the Hospital are distinguishable from the present matter as they concerned negligence *per se* and not negligence.

The Pennsylvania Supreme Court concisely summarized the distinction between negligence *per se* and negligence. Traditional negligence requires a plaintiff to establish four separate elements: "(1) the defendant owed the plaintiff a duty or obligation recognized by law; (2) the defendant breached that duty; (3) a causal connection existed between the defendant's conduct and the resulting injury; and (4) actual damages occurred." *Grove v. Port Auth.*, 218 A.3d 877, 888-889 (Pa. 2019) (citations and quotation marks omitted). In contrast, in a negligence *per se* claim, the first two elements of a traditional negligence claim are replaced by a requirement that the plaintiff establish: (1) a statute provides the applicable duty; and (2) the defendant breached that duty. *See id*. Even under a negligence *per se* claim, the plaintiff must still establish causation and the occurrence of actual damages. *See id*.

The distinction in cases such as this one is subtle but is focused on the effect given to the statute being presented. Under a negligence *per se* claim, the issue is the legal question of whether the statute establishes a duty the defendant owed to the plaintiff. *See McCloud v. McLaughlin*, 837 A.2d 541,

- 10 -

545 (Pa. Super. 2003). If a plaintiff can persuade a judge that the statute creates a duty, then any failure of the defendant to obey the statute is a breach of duty as a matter of law. *See Grove v. Port Auth.*, 218 A.3d 877, 889 (Pa. 2019). In contrast, if the plaintiff cannot establish that a statute creates an applicable duty, she may still argue that it establishes the standard of care as a matter of fact. *See id*. Under a traditional common law negligence claim, a plaintiff must present evidence to establish the standard of care the defendant owed to the plaintiff under the circumstances. *See id*. The existence and scope of the duty at common law is generally considered a question of fact for the chosen fact-finder to resolve.

Here, Robinson's cause of action was based on premises liability in conjunction with general negligence. *See generally* Second Amended Civil Action Complaint – Premises Liability/General Negligence, 3/16/2017. She did not assert any claim for negligence per se. *See id*.

Contrary to the Hospital's argument, this case was not about the construction of the parking lot but rather, the Hospital's placement of handicapped parking spaces at certain spots on its property and whether that decision fell below the standard of care resulting in Robinson's injuries. The ADA evidence was not used to establish as a matter of law that the Hospital had breached a duty towards Robinson. Instead, Robinson argued that it was relevant to assessing the Hospital's standard of care in its management of the property.

In premises liability negligence cases, "[t]he standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." **Carrender v. Fitterer**, 469 A.2d 120, 123 (Pa. 1983) (citation omitted). As the trial court points out, "The parties do not disagree that [Robinson] was a business invitee entering the Hospital for a doctor's appointment. She was there for a purpose directly connected with the Hospital's business dealings." Memorandum in Support of Orders Denying Post-Trial Relief and Granting Delay Damages, 10/21/2019, at 8.

Because Robinson was considered an invitee, the Hospital owed her "the highest duty owed to any entrant upon land. The landowner is under an affirmative duty to protect a business visitor not only against known dangers but also against those which might be discovered with reasonable care." **Emge v. Hogosky**, 712 A.2d 315, 317 (Pa. Super. 1998) (citation omitted). **See also Campisi v. Acme Mkts.**, 915 A.2d 117, 119 (Pa. Super. 2006).

In assessing the scope of the duty owed to business invitees by property owners, Restatement (Second) of Torts § 343, provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

- 12 -

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (2d) of Torts § 343. ***See also Rodriguez v. Kravco Simon Co.***, 111 A.3d 1191, 1193 (Pa. Super. 2015).

This Court has explained the limitations of Section 343 as follows:

[T]he mere existence of a harmful condition in a public place of business, or the mere happening of an accident due to such a condition is neither, in and of itself, evidence of a breach of the proprietor's duty of care to his invitees, nor raises a presumption of negligence. In order to recover damages in a slip and fall case such as this, the invitee must present evidence which proves that the store owner deviated in some way from his duty of reasonable care under the existing circumstances. This evidence must show that the proprietor knew, or in the exercise of reasonable care should have known, of the existence of the harmful condition. Section 343 also requires the invitee to prove either that the store owner helped to create the harmful condition, or that it had actual or constructive notice of the condition.

***Zito v. Merit Outlet Stores***, 647 A.2d 573, 575 (Pa. Super. 1994) (internal citations and quotation marks omitted).

Under these circumstances, the ADA evidence was relevant to several of Robinson's burdens at trial. First, despite the fact that the ADA does establish negligence *per se*, the standards set forth in the ADA are clearly relevant to whether the slope in the parking space constituted a dangerous condition of the property. The Hospital was free to counter the ADA evidence by presenting expert evidence that the slope of the parking spot was not dangerous despite being four times the slope set forth in the ADA.

Second, the ADA evidence was relevant to the question of whether the Hospital should have known that the slope of the parking spot was dangerous.

- 13 -

The ADA evidence tended to prove, but admittedly did not establish, that any slope greater than 2% was dangerous. Once again, the Hospital was free to counter this suggestion by presenting evidence that it had no reason to be aware of the dangerousness of the greater than 8% slope in the parking spot.

With this in mind, we note that the Hospital's own expert, Richard E. Daniels, P.E., relied upon the ADA to set the standard by which handicapped parking spaces were graded. *See* Plaintiff's Opposition to the Motion in Limine of Defendant, Mercy Fitzgerald Hospital and Trinity Health, to Preclude Plaintiffs from Referencing the ADA and Comparable Pennsylvania Standards at Trial, 5/17/2019, at Exhibit C (Daniel's Report), p. 6.

Daniels indicated that under the ADA, "access aisles are required to be nearly level in all directions to provide a surface for wheelchair transfer to and from vehicles but the 2% slope is permitted to allow sufficient slope for drainage." *Id.* He opined that he measured the slopes at issue and determined they "exceeded these limits." *Id.*

However, Daniels did not opine that the slope of the parking spot was safe for wheelchair use, but instead placed the blame on Green, the driver, and testified that she made a "bad choice" when she decided to park the van in the spot at issue. N.T., 5/22/2019, at 156. Daniels opined that Green should have parked in a different location like the pick-up and drop off area because the parking spot "was not intended for ramp deployment onto an adjacent conventional parking stall." *Id.*, at 150. He also stated that the spot at issue

"would have worked fine if the van had been backed in instead of head in."

**Id.**, at 155. Therefore, Daniels conceded that the parking spot was dangerous. Moreover, he opined that it was so dangerous that a simple visual inspection should reveal the risk.

Accordingly, we conclude that the court did not err in allowing Robinson to present the ADA evidence. Furthermore, even if it did, the Hospital suffered no prejudice, as the Hospital's own expert conceded that the parking spot was obviously dangerous. The Hospital's defense at trial was not that the parking spot was in fact safe, but rather that the parking spot was so obviously dangerous that Green should have recognized the risk. The admission of the ADA evidence would not have affected the jury's consideration on this factual issue. The Hospital's first argument fails.

Next, the Hospital contends the court erred in denying its motion in *limine* to preclude future medical expenses based on Robinson's medical expert, Dr. Fras. **See** Appellant's Brief, at 8. It states:

> In his report Dr. Fras acknowledges that [Robinson]'s alleged ongoing pain pre-existed the accident but was aggravated by the accident. Therefore, the $100,0000 in future medical expenses for pain management is not causally related to the accident because pain management is ongoing due to [Robinson]'s 2005 paralyzing accident and her 2011 SEPTA accident in which she broke both her ankles and had a rod inserted in her broken leg, and injured her back. The $100,000 future medical damages are just an attempt by [Robinson] to inflate her boardable damages to inflame the jury and prejudice Defendants. Cross examination of Dr. Fras on the $100,000 figure established that he could not relate the need for spinal cord therapy to the March 22, 2016 accident. Dr. Fras did not specify or testify regarding any other future treatment other than the aforesaid spinal cord therapy.

*Id.*, at 8.

As a prefatory matter, a review of the Hospital's argument on appeal reveals that it departs from the issue raised in its Rule 1925(b) concise statement in terms of procedural posture. In its concise statement, the Hospital argued that at trial, the court erred and abused its discretion "in permitting $100,000 in future medical expenses when Dr. Fras admitted on cross examination that he could not relate the need for spinal cord therapy to the March 22, 2016 accident." Appellant's 1925(b) Statement of Matters Complained of on Appeal, 12/12/2019, at § 6. On appeal, as stated above, the Hospital contends the court erred in denying its motion in *limine* to preclude future medical expenses. Furthermore, we observe that the argument section of the Hospital's brief on this issue consists of two paragraphs and lacks any citation to relevant authority. While these discrepancies do not result in preclusion of meaningful review, we remind the Hospital of Pennsylvania Rules of Appellate Procedure 302, 1925(b)(4)(vii) and 2119(b). However, we will confine our analysis to reviewing whether Dr. Fras's testimony was sufficient to support the award of $100,000 of future medical expenses.

A plaintiff must present expert testimony to establish a right to compensation for future medical damages:

> [i]t is well-settled that an item of damage claimed by a plaintiff can properly be submitted to the jury only where the burden of establishing damages by proper testimony has been met. In the

context of a claim for future medical expenses, the movant must prove, by expert testimony, not only that future medical expenses will be incurred, but also the reasonable estimated cost of such services. Because the estimated cost of future medical services is not within the layperson's general knowledge, the requirement of such testimony eliminates the prospect that the jury's award will be speculative.

***Mendralla v. Weaver Corp.***, 703 A.2d 480, 485 (Pa. Super. 1997) (citations and quotation marks omitted).

The trial court found that Dr. Fras's testimony provided sufficient support for the award of future medical expenses:

In this context for future medical expenses, Dr. Fras opined about the nature of the future treatment and also the reasonable estimated costs for such services. [Robinson] provided jurors with expert evidence to enable them to estimate damages without engaging in speculation.

[During Dr. Fras' videotaped testimony, the] orthopedic surgeon testified that the injuries in association with the incident of March 22, 2016, included aggravation of lumbar degenerative disc disease and spondylosis, left tibial shaft fracture, aggravation of arthritis. He outlined future treatments for Plaintiff-Robinson to include physical therapy, manipulative therapy, pain management, including pharmacologic pain management, injections, such as facet injections or epidurals, radiofrequency ablation, a procedure where doctors "burn off some of the nerves causing pain," and, ultimately, a spinal cord stimulator. This involves a series of electrodes that are inserted into the spinal canal and "sit on the top of the spinal cord." A battery pack is surgically inserted and blocks the pain signals going to the brain.

Dr. Fras was asked whether the treatments Mrs. Robinson received and the future treatments he described were reasonable and necessary care and necessitated by the incident in the parking lot of Defendant-Hospital. He said "yes." Dr. Fras opined that an estimate of fees for future treatment "will exceed $100,000.00." He explained the basis for his opinion that more advanced pain management interventions, such as radiofrequency ablation or spinal cord stimulator are more involved and carry significant

- 17 -

costs. The transcript reveals that this expert witness provided the estimated costs of anticipated medical services specifically related to the March, 2016 accident.

Memorandum in Support of Orders Denying Post-Trial Relief and Granting Delay Damages, 10/21/2019, at 11-12 (record citations and citations omitted).

We agree with the trial court's analysis. Dr. Fras has been a board-certified orthopedic surgeon for 19 years and he specializes in surgery of the spine. N.T., 5/20/2019 (Trial Deposition of Christian Fras, M.D.), at 6-8. He stated he conducts an independent medical evaluation of the individual regardless of the requesting party, which includes an intake sheet to be filled out by the individual and a physical examination. *Id.*, at 16-17. His testimony regarding Robinson's future medical treatments was limited to her condition following the March 2016 accident and included physical therapy, manipulative therapy, pain management, and a spinal cord simulator. *Id.*, at 28-29. The expert indicated the treatments were reasonable and necessary to address the injuries suffered by Robinson because of the March 2016 accident. *Id.*, at 32.

Notably, Dr. Fras was extensively cross-examined about his assessment of Robinson, including his knowledge of Robinson's prior pain history. *Id.*, at 34-87. He testified that while Robinson mentioned she had prior low back pain before the injury, she now endured lower extremity complaints. *Id.*, at 37. Dr. Fras stated that he based his assessment on the totality of the information

he had before him, which did not include Robinson's medical records prior to the date of the accident. *Id.*, at 74. Additionally, when asked if the future treatments at issue are most likely related to the prior 2005 spinal cord injury with a spinal fusion, Dr. Fras answered, "No … not at all." *Id.*, at 85.

As for the Hospital's contention that Dr. Fras could not relate the need for spinal cord therapy to the March 2016 accident, the Hospital does not point to a place in the record where the expert made this statement. *See* Appellant's Brief, at unnumbered 8-9. Moreover, it misrepresents the testimony. A review of the record reveals that counsel for the Hospital asked Dr. Fras if the spinal cord simulator treatment was the result of a spinal cord injury in the March 2016 accident or the 2005 accident. *See* N.T., 5/20/2019 (Trial Deposition of Christian Fras, M.D.), at 36. Dr. Fras answered in the negative to both questions and further explained that "treatment with a spinal cord stimulator is not treatment for a spinal cord injury." *Id.* Accordingly, we conclude Robinson presented sufficient evidence at trial to support and the trial court did not abuse its discretion in admitting this evidence. Therefore, the Hospital's second argument fails.

Next, the Hospital claims the court erred in giving a spoliation and negative inference charge to the jury regarding Mercy's Security Manager's, Officer Harrison, failure to preserve video of the parking lot. The Hospital contrasts this decision with the court's denial of the Hospital's request for the same charge on Robinson's failure to produce eight photographs taken by

Terence Robinson on the day of the incident and relied upon by Robinson's

liability expert. ***See*** Appellant's Brief, at 9. The Hospital states Robinson failed

to put forth evidence suggesting that the Hospital's inability to produce the

video at issue was done in bad faith or that the video was destroyed or

intentionally withheld. ***See id.***, at 10. Furthermore, it alleges that Robinson

suffered no prejudice because she had an opportunity to photograph, and did

so, as well as videotape the accident scene in detail on the day of the accident.

***See id.***

We are guided by the following:

"Spoliation of evidence" is the failure to preserve or the significant alteration of evidence for pending or future litigation. When a party to a suit has been charged with spoliating evidence in that suit (sometimes called "first-party spoliation"), we have allowed trial courts to exercise their discretion to impose a range of sanctions against the spoliator. This Court has stated:

When reviewing a court's decision to grant or deny a spoliation sanction, we must determine whether the court abused its discretion. Such sanctions arise out of the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the evidence. Our courts have recognized accordingly that one potential remedy for the loss or destruction of evidence by the party controlling it is to allow the jury to apply its common sense and draw an "adverse inference" against that party.

…

To determine the appropriate sanction for spoliation, the trial court must weigh three factors:

- 20 -

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.
>
> In this context, evaluation of the first prong, the fault of the party who altered or destroyed the evidence, requires consideration of two components, the extent of the offending party's duty or responsibility to preserve the relevant evidence, and the presence or absence of bad faith. The duty prong, in turn, is established where: (1) the plaintiff knows that litigation against the defendants is pending or likely; and (2) it is foreseeable that discarding the evidence would be prejudicial to the defendants.

*Parr v. Ford Motor Co.*, 109 A.3d 682, 701-702 (Pa. Super. 2014) (citations and some quotation marks omitted).

Here, the trial court pointed to the significant distinctions between the photographs taken by Terence Robinson and Officer Harrison as the basis for the disparate treatment of the two requests for spoliation instructions:

> It is not clear what the basis of this argument is because the trial record reveals that only one photo was taken by Mr. Robinson on the day after the incident. The jury saw that photo. A spoliation instruction was not appropriate in these circumstances. Mr. Robinson's testimony on direct and cross-examination was that he returned to the site on the day after the accident.
>
> When a party disposes of or fails to produce evidence which is relevant to the issue in the lawsuit, the jury may find that the evidence would have been unfavorable to that party unless there is a satisfactory explanation for the failure to produce the evidence.
>
> Mr. Elliot Harrison, [a] 13[-]year employee, is the Security Manager at Mercy Fitzgerald Hospital. He testified about the events of March 22, 2016. While he drove his security vehicle patrolling the Hospital campus, he received a radio call to go to the West Lobby Area. He observed Mrs. Robinson face down on

the pavement. She stated she hit her head and was in pain. Mr. Harrison did not take any photos because there is a video surveillance camera in the parking lot. Mr. Harrison testified that the video camera rotates 360 degrees and records on DVR. This gentleman offered the Hospital's explanation why the video was not produced: The video did not show the area of the incident; "did not pick up that area;" did not show the van drive into the parking lot; did not show the incident or the crowd gathered; did not record the ambulance arrive; never saw the parked van or Ms. Green in the video when she drove into the parking lot.

The video would have been the only photographic evidence taken on the day of Ms. Robinson's accident. The jury saw dozens of black and white and color photographs -- all taken days and years post-accident. It was up to the finders of fact to assess whether the explanation provided by the Hospital was or was not satisfactory as to why the video was not produced. When considering a. The degree of fault of the Hospital, b. The degree of prejudice to the opposing party, and, c. Whether there was a lesser sanction available, this Court concluded that [Robinson] was prejudiced. Much of the trial testimony focused on which parking space was used on the incident date; where was the van's ramp situated; what was Mrs. Robinson's position on the ground; how was she transported by the responders; and, other questions which could have been established by the Security Manager's video evidence.

Memorandum in Support of Orders Denying Post-Trial Relief and Granting Delay Damages, 10/21/2019, at 13-14 (record citations and citations omitted).

The record supports the trial court's determination. We begin with the photograph mentioned during Terence Robinson's testimony. The Hospital again misconstrues the evidence presented at trial. Terence testified that he took one photograph the day after the accident. *See* N.T., 5/20/2019, at 140-141. Robinson's counsel showed him a picture which was part of collection of

photographs marked P-1, and asked Terence if it was his photograph and he replied that he did not believe it was the same picture. ***See id.***, at 141.

On cross-examination, defense counsel asked if it was possible that Terence took more than one photograph, to which he said that it was. ***See*** N.T., 5/20/2019, at 154. Counsel then asked if he still had the phone that he used to take the "photographs[.]" ***Id.*** Terence responded that he did not. ***See id.***

Subsequently, Mark S. Suchecki, P.E., the plaintiff's expert, testified about the eight photographs and stated that he was "under the impression" Terence took them as they been sent by plaintiff's prior counsel. N.T., 5/21/2019, at 24-25. He stated that he had copies of the photographs in his file but he did not bring the file with him on the day of trial. ***See id.***, at 25. Additionally, he stated he selected one photograph to include in his report because he "thought it was most demonstrative of the conditions" at the parking lot. ***Id.***, at 26.

On the last day of trial, during a discussion between the parties and the trial court, the spoliation issue was raised. Defense counsel contended:

> But it's also the photographs that were testified to by plaintiff's expert, taken by Mr. Robinson on the day of the accident, the eight photos. And they've never been produced. And I asked the expert where they were, and he said he didn't have them.
>
> I asked Mr. Robinson. He said he didn't have any. So there's eight photographs taken on the day of the accident that were solely in plaintiff's control that have never been shown to the jury[.]

N.T., 5/23/2019 (a.m.), at 28. The following exchange then occurred:

[Counsel for Robinson]: Your Honor, the testimony during the trial was whether or not the expert received the eight photographs. P-1 is eight photographs. Now, I wasn't the attorney involved during discovery. Your Honor, but I find it hard to believe these eight photographs were never produced. Not only that … they've been marked a P-1 for the last week. I never heard counsel say I don't have that, I didn't get that. I don't know what this is. Maybe there's some confusion as to who took the photographs.

But, again, P-1 is eight photographs. The expert testified he looked at eight photographs. I don't think [defense counsel] is disputing she has or hasn't had the eight photographs. There's no evidence that it was not in the possession of the defendant. The question is, was the expert right as to who took them or when they were taken, but there's no spoliation. Nothing has been destroyed or altered.

[Counsel for the Hospital]: Your Honor, I asked the expert to show me the eight photographs that he was supplied by plaintiff's counsel, whether it was [plaintiff's counsel] or his predecessor, and he said he did not have them.

Mr. Robinson testified that he took one photograph on the next day. So there's missing evidence that should have been produced with the expert, should have been produced in discovery. There's never been eight photographs taken by Mr. Robinson on the day of the accident produced in discovery…. I had the entire plaintiff's expert's testimony printed out and he said he does not have them.

[Counsel for Robinson]: He doesn't have them with him, Your Honor. Not only that, those photographs, there was an acknowledgement of an existence of those photographs. If this was an issue for the defendant, they could have, during the course of discovery, filed motions to compel those photographs. There was no discussion that they were destroyed or not produce[d].

…

- 24 -

If counsel [for the Hospital] is claiming there are different eight photographs, she could have done due diligence during discovery and filed a motion to compel the eight photographs, if she thinks they are actually different, which I doubt they are.

…

THE COURT: So the question is, who took the photographs? Is that what you're saying?

…

But the first question is, who took them? But if you read the jury charges that the two sides are arguing about, we have to know who took them. That is, is the evidence within the control of one party or the other?

But if we don't know who took them, we can't say whether or not they are in the control.

[Counsel for the Hospital]: The plaintiff's liability expert testified and also wrote in his report that the photographs were taken by Mr. Robinson….

THE COURT: Right. But Robinson said he didn't take them.

*Id.*, at 29-32.

The testimony and argument do not demonstrate that Robinson failed to preserve or significantly altered the photographic evidence for pending litigation. *See Parr*, 109 A.3d at 701-702. As the trial court properly noted, while there was some confusion as who took the photograph, the evidence establishes that Terence did take one photograph on the day after the accident and that photograph was introduced at trial. Moreover, the Hospital did not meet its burden in establishing that Robinson intentionally or purposely destroyed evidence, or even that the failure on the expert's part to bring the

eight photographs to trial, was done with the purpose of prejudicing the Hospital. *See id.* Accordingly, we conclude the trial court did not abuse its discretion in failing to provide a jury instruction regarding the eight photographs.

We now turn to the Hospital's surveillance video. At trial, Harrison testified that he responded to the accident and subsequently reviewed the surveillance video as security protocol. *See* N.T., 5/21/2019, at 71-72, 81. He stated that there was only one camera in the area at issue and it did not capture the accident or even the area where Robinson's van was parked. *See id.*, at 74-75, 79. When asked what the camera showed, Harrison explained that it was a rotating camera that spun around in a 360-degree motion. *See id.*, at 71, 75. He indicated the camera did have capability to pause and zoom in and out. *See id.*, at 83-84. Harrison also testified he was not aware of whether the Hospital had a policy on preserving videos of an incident and that the decision to preserve the video was entrusted to him and another employee. *See id.*, at 81, 87.

We conclude that the court did not abuse its discretion in issuing an adverse inference spoliation instruction[6] due to the Hospital's failure to

---

[6] *See* N.T., 5/23/2019 (p.m.), at 16 ("You heard evidence that there was a video that was not produced. When a piece of evidence is within the control of one party in a lawsuit and would have be relevant and helpful to that party and that party does not satisfactorily explain why it was not produced during the trial, you may find that the evidence would have been unfavorable to that
*(Footnote Continued Next Page)*

preserve the parking lot surveillance video. As the trial court pointed out, this video was the only photographic evidence taken on the day of Robinson's accident and would have been relevant to numerous issues at trial, including the location of Robinson's van in the parking lot. While the court did not specifically find that the destruction of the video was done in bad faith, it indicated it was up to the jury to determine whether the explanation provided by the Hospital was satisfactory explanation for why the video was not produced. Accordingly, we discern no abuse of discretion on the record before us. Therefore, the Hospital's third argument is unavailing.

Lastly, the Hospital asserts that the court erred in denying its motion for a remittitur or a reduction of damages because the jury's award was grossly excessive, against the weight of the evidence, and unsupported by the evidence. **See** Appellant's Brief, at 12. The Hospital contends the evidence only demonstrated that Robinson had the same issues and pain "before the accident as she did after the accident." **See id.**, at 13. It further states the "jurors were impermissibly influenced by passion, mistake, sympathy, emotion, and/or prejudice due to her wheelchair bound condition which pre-

---

party if it had been produced. If a party disposes of a piece of evidence before the other party has had an opportunity to inspect it and if the party who disposed of the evidence should have recognized the evidence was relevant to an issue in this lawsuit, you may find that this evidence would have been unfavorable to the party unless they satisfactorily explain why they disposed of the evidence.")

- 27 -

existed the accident" at the hospital parking lot. *Id.* The Hospital also points to the following: Robinson presented evidence of a fracture of an already completely paralyzed leg that did not require surgery that subsequently healed, Green testified Robinson's pre- and post-accident level of activity was the same, and Robinson did not assert wage loss or punitive damages claims. *See id.*, at 14. The Hospital concludes, "There was simply no evidence presented to support such a shocking and exorbitant jury award from a relatively minor trip and fall accident." *Id.*

Our standard of review in considering the reversal of a trial court's order denying a remittitur is to determine whether the trial court abused its discretion or committed an error of law in reaching such decision. In that regard, this Court, in *Mecca v. Lukasik*, 366 Pa. Super. 149, 530 A.2d 1334 (Pa. Super. 1987), discussed the factors to be considered in determining whether or not a verdict is excessive:

The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. A court may consider the following factors, *inter alia*:

(1) the severity of the injury; (2) whether the Plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the Plaintiff (and, herein, the court pointed out that where the injury is manifested by broken bones, disfigurement, loss of consciousness, or other objective evidence, the courts have counted this in favor of sustaining a verdict); (3) whether the injury will affect the Plaintiff

- 28 -

permanently; (4) whether the Plaintiff can continue with his or her employment; (5) the size of the Plaintiff's out-of-pocket expenses; and (6) the amount Plaintiff demanded in the original complaint.

*Paliometros v. Loyola*, 932 A.2d 128, 134-135 (Pa. Super. 2007) (some citations omitted).

The court found that the jury's award of damages was aligned with the weight of the evidence presented at trial:

In this trial, the economic losses of past medical expenses were stipulated by the parties. The future medical expenses were supported by medical expert testimony. The Defendant-Hospital's challenge to the non-economic damages award is baseless.

The jury was instructed by agreement of the parties. Past and future pain and suffering includes "all physical pain, mental anguish, discomfort, inconvenience and distress" that Plaintiff-Robinson has endured and will continue to endure. The jury heard from Mr. Robinson, Mrs. Robinson, Bianca Green and medical testimony about the back spasms, facial abrasions, and overall pain and soreness suffered by [Robinson] after the fall.

Michelle Robinson explained to the jury that ever since the 2016 accident her pain medications have been increased by her physicians. She uses a pain patch on her arm now. She feels a burning in her back that was not present before. Although she had medications for her leg spasms before, the dosages have been increased since 2016. She feels burning sensations in her left leg now. She "lost" part of her heel when her skin broke down in the cast in 2016. She cannot put on her shoe. Her leg and part of her knee cap broke in the 2016 fall.

[Terence] Robinson described how his wife cried at night. He massaged her back because she was in pain.

The jury was instructed that [Robinson] is entitled to be compensated for past and future embarrassment and humiliation she endured. She is entitled to be fairly compensated for the loss of her ability to enjoy any pleasures of life as a result of the incident. The jury heard testimony from the Security Guard and

Bianca Green describing Mrs. Robinson lying face down on the asphalt, crying in pain. The Hospital staff and strangers watching as the wheelchair was unstrapped from her body. The jury heard about [Robinson]'s bed on the first floor of her home and personal hygiene performed there by Bianca Green.

Michelle Robinson described how the wheelchair went down the ramp "fast like a roller coaster." Her head under a car and her body twisted, but she could not turn or move. She had bruises on her head; face bleeding; leg bleeding, and her back "on fire." She had small rocks and pebbles on her face which Ms. Green brushed away.

…

Many tangible and intangible items of damages were properly considered by our trial jurors. While appraising all of the factors encompassed in economic loss and non-economic loss, this Court which sits as an experienced Civil Trial Court and which had the benefit of seeing and hearing all of the evidence, has no hesitancy in concluding that the jury's verdict was fair, thoughtful and reasonable. The verdict award does not shock this Court's conscience.

Memorandum in Support of Orders Denying Post-Trial Relief and Granting Delay Damages, 10/21/2019, at 16-19 (record citations and citations omitted).

The court thoroughly explains its analysis for denying remittitur and we affirm on the basis of that analysis while adding several comments. First, it merits emphasis that large verdicts are not necessarily excessive verdicts, and each case is unique and dependent on its own special circumstances. *See* *Crespo v. Hughes*, 167 A.3d 168, 189 (Pa. Super. 2017). Second, contrary to the Hospital's attempt to minimize the injuries Robinson suffered from the accident and assert that she suffered the same issues and pain before the

accident as she did after the accident, the jury heard Robinson herself about how she ended up with her head under a car, her face in the asphalt, and her body twisted in the wheelchair on the ground. The jury also heard Dr. Fras' expert medical testimony about her new injuries as result of the accident, which included aggravation of lumbar degenerative disc disease and spondylosis, left tibial shaft fracture, aggravation of arthritis. ***See*** Memorandum in Support of Orders Denying Post-Trial Relief and Granting Delay Damages, 10/21/2019, at 12. Accordingly, in light of this testimony, we cannot conclude that the trial court erred in finding the jury's award is supported by the record and not excessive, arbitrary or unreasonable in relation to the evidence adduced at trial. Therefore, we conclude the Hospital's final argument fails as the trial court did not erred in denying the request for a remittitur.

Judgment affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 7/7/2021*